The Honorable Bill Gwatney State Senator P.O. Box 156 Jacksonville, AR 72076-0156
Dear Senator Gwatney:
I am writing in response to your request for my opinion on whether there are any constitutional restrictions that would preclude the Arkansas General Assembly from requiring that the University of Arkansas play a certain number of football games in Little Rock.
RESPONSE
State law clearly gives the General Assembly (hereinafter the "Legislature") a wide range of powers and it also clearly gives the University of Arkansas Board of Trustees (hereinafter the "Board") some degree of independence from political pressure in managing the affairs of the University. The line where the Legislature's powers end and where the Board's begin has never been and perhaps cannot be clearly defined. However, for the reasons set forth below, I think the Board probably has the ultimate authority to determine where athletic events will be held.
I must stress two things at the outset. First, you have not asked for my opinion on where the Arkansas Razorbacks should play their football games. Your question concerns the purely legal issue of whether the Legislature has the constitutional authority to dictate the location of Razorback home football games. Second, and more importantly, although the question you present relates only to football games, there is actually a much broader issue at stake — namely, to what degree can the Legislature involve itself in a state-funded university's affairs? This broader issue touches on concepts like academic freedom and political influence on the quality of higher education in our state. I will not attempt to confront those issues in this opinion, but this opinion must be understood in a context broader and more substantial than football games.
In responding to your request, I am guided by the following tenet stated in Hooker v. Parkin, 235 Ark. 218, 221, 357 S.W.2d 534 (1962):
 [O]ur state Constitution is a restrictive document; whereas our Federal Constitution is a document of delegated powers. The Federal Government has no right to act in a given field unless authority to do so has been delegated to it by the States. To the contrary, the Legislature (which is made up of the people's elected representatives and spokesmen) has absolute power and authority to legislate in all fields unless prohibited or restricted from doing so by the State Constitution or unless authority to so act has been delegated to the Federal Government and such authority has been exercised by the Federal Government.
(Emphasis added.)
The Legislature does not have absolute power and authority when it comes to the state's public universities. Amendment 33 to the Arkansas Constitution establishes some limits. In my opinion, the answer to your question turns on the application of Amendment 33. This amendment does not apply solely to the Board, or even to boards of trustees for higher education. It is generic in nature and applies to all boards and commissions "charged with the management or control of all charitable, penal or correctional institutions and institutions of higher learning of the State of Arkansas." In pertinent part, Amendment 33 provides:
BOARDS AND COMMISSIONS GOVERNING STATE INSTITUTIONS
* * *
 2. Abolition or transfer of powers of board or commission — Restrictions.
 The board or commission of any institution, governed by this amendment, shall not be abolished nor shall the powers vested in any such board or commission be transferred, unless the institution is abolished or consolidated with some other State institution.[1] In the event of abolition or consolidation, the new board or commission shall consist of a membership of five, seven, or ten.
(Emphasis added.) As reflected in the highlighted passage, this amendment prohibits any "transfer" of "vested" power from the Board unless the University of Arkansas is abolished or consolidated with another institution. The Arkansas Supreme Court has not interpreted this part of Amendment 33, and, as discussed below, I cannot say with exactness where the Legislature's powers end and the Board's begin.
In Arkansas-Missouri Power Corp. v. City Of Rector, 214 Ark. 649, 655,217 S.W.2d 335 (1949), the Supreme Court observed that "[w]here ordinary words are used in the Constitution, they must be construed in their popular and general sense, as the people who voted for it would understand them."
The term "transfer" does not invite elaborate construction or interpretation. Black's Law Dictionary defines the term as follows: "To convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of. . . ." Basically the term "transfer" means to pass from one to another. Therefore, a "transfer" occurs when a vested power is shifted from the Board to the Legislature.
The power in question is the ability to decide where the Razorbacks play their home football games. But is that a "vested" power? Black's Law Dictionary defines the term "vested" in pertinent part, as follows: "Fixed; accrued; settled; absolute. Having the character or given the rights of absolute ownership; not contingent; not subject to be defeated by a condition precedent." While helpful in some respects, this definition appears to beg the central question — namely, exactly which powers are vested in the Board? Here lies the fundamental uncertainty.
The intent of the language is important. As the Supreme Court noted inCity of Fayetteville v. Phillips, 320 Ark. 540, 544, 899 S.W.2d 57
(1995), it is impermissible "to endorse a procedure that could result in whittling away at the intent of the Constitution." With respect to determining constitutional intent, the Supreme Court has further observed:
 In construing an ambiguous provision, this court should focus on voters' intent and not the intent of legislators or vested-interest groups. We have held that in construing the provisions of the constitution we endeavor to effectuate as nearly as possible the intent of the people in passing the measure, and if necessary as a means of attaining that end, a liberal interpretation will be warranted as it may be ascertained from the language used. See Knox v. Williamson, 241 Ark. 455, 408 S.W.2d 501 (1966); Raney v. Raulston, 238 Ark. 875, 385 S.W.2d 651 (1965).
Southwest Arkansas Communications, Inc. v. Arrington, 296 Ark. 141,147-48, 753 S.W.2d 267 (1988) (emphasis added).
As the Supreme Court noted in City Of Little Rock v. ATT Communicationsof the Southwest, Inc., 318 Ark. 616, 622, 888 S.W. 2d 290 (1994), it is fully appropriate, in attempting to determine the intention behind a law, to examine the law "historically, as well as the contemporaneous conditions at the time of its enactment, consequences of interpretation, and matters of common knowledge within the limits of this court's jurisdiction. Mears, County Judge v. Ark. State Hospital, 265 Ark. 844,581 S.W.2d 339 (1979); see also Hot Springs Elec. Light Co.,70 Ark. 300, 67 S.W. 762." Unfortunately, there is no helpful legislative history, but the history of the amendment is somewhat illuminating. This is perhaps best summarized in Robert A. Leflar's, The First 100 Years:Centennial History of the University of Arkansas 173-182 (Univ. of Arkansas Foundation 1972).
Professor Leflar reports that the groundwork for Amendment 33 was laid in 1939, when Governor Carl Bailey persuaded the Board, which was heavily weighted with Bailey appointees, to elect J. William Fulbright to the presidency of the University of Arkansas. Bailey then wielded his influence to persuade the Board to adopt a mandatory-retirement policy apparently designed to remove several professors whom the governor held in disfavor. The new policy was highly unpopular with the faculty. In 1940, Bailey ran for re-election and lost to Homer Adkins, who fervently wished to purge the University of Bailey supporters, including Fulbright. In spite of his promise to "Take the University out of Politics," Adkins pressured the Legislature to change the law to allow him to appoint anew all members of the Board. The leadership of the Legislature balked but promised they would secure enough resignations to assure him a majority of supporters on the Board. The Legislature followed through on this promise, whereupon Adkins prevailed upon the new Board to fire Fulbright and various other Bailey supporters.[2] These politically motivated firings generated loud protest both on campus and in the press. In 1942, the political manipulation of the Board by both Bailey and Adkins prompted the Little Rock Civitan Club to sponsor Amendment 33, which was designed to stabilize Board membership by freezing the number of members and staggering their terms. The amendment laid out the procedure for removing a board member and restricted any transfer of its vested powers.
 This background is instructive in that it reflects that the people adopted Amendment 33 in reaction to both executive and legislative intrusion into University affairs. It appears the voters, in prohibiting the "transfer" of the Board's "vested" powers, intended to preclude any conveyance of the Board's substantive policymaking authority to any other entity, be it another board, an administrative agency, the governor or even the Legislature itself.
The emergency clause of Act 272 of 1943, the legislation enabling the implementation of Amendment 33, states:
 It is hereby declared and found that delay in the effective date of this Act would be contrary to the will of the people of the State of Arkansas . . . and would be in conflict with the purpose of the Amendment and would have a tendency to render uncertain the policies and actions of the Board of Trustees of the University of Arkansas; [and] that the Board of Trustees, as constituted under Amendment 33, should begin immediately the shaping of the policies of the school. . . .
(Emphasis added.) This emergency clause demonstrates the Legislature's contemporaneous recognition that the voters intended the Board immediately and without interference to pursue policies of their own devising. The Arkansas Supreme Court has held that a statute enacted shortly after a constitutional amendment should be given weight as indicating the appropriate construction of the constitutional provision under which the statute was enacted. See Hays v. McDaniel, 130 Ark. 52,196 S.W. 934 (1917). The court has also held that while a legislative interpretation of a constitutional provision is not binding, it is persuasive and entitled to consideration if there is any doubt or ambiguity concerning the constitutional provision. See Mears v. Hall,263 Ark. 827, 569 S.W.2d 91 (1978). See also Stayton v. Paschall, 9 F.2d 109
(D.C. Ark. 1925).
Significantly, the Legislature has acknowledged the limitations placed on it by Amendment 33 on a number of other occasions. The Legislature has been fairly consistent in recognizing that while it retains control over appropriations, administrative and budgetary matters, Amendment 33 insulates covered boards from legislative interference in matters of policy. See, e.g., A.C.A. § 12-27-105(1)(A); A.C.A. § 25-10-111(c)(1); A.C.A. § 25-10-104(d)(1); and A.C.A. § 25-10-402; but see A.C.A. §6-61-201 et seq. (investing the Arkansas Higher Education Coordinating Board with specified decision-making powers in matters of higher education).
A legislative acknowledgement of the need to maintain Board authority in certain matters of policy is even found in the act that defined the Board's powers — legislation enacted as Act 95 of 1887, long before Amendment 33 was adopted:
A.C.A. § 6-64-202. Board incorporated — Powers and authority.
 The board is made a body politic and corporate and shall have all the powers of a corporate body, subject to the Constitution and laws of the State of Arkansas, and the board possesses all the power and authority possessed by the board of trustees of the university under laws existing on March 30, 1887.[3]
Simply put, the Legislature has very broad powers but its powers are defined by the State Constitution, which has incorporated as a matter of constitutional law what previously was merely a statutory grant of Board "power and authority." If the Legislature (or the Governor) could routinely interfere with University affairs, it would render Amendment 33 meaningless. In my opinion, the Legislature has correctly acknowledged that matters of University policy rest with the Board.
This office has previously recognized this distinction between policy-making and administration. It has opined that, on the one hand, whereas Amendment 33 would not bar the General Assembly from establishing a classification and compensation plan for employees at institutions of higher education, Op. Att'y Gen. 88-302, on the other, it would bar the General Assembly from divesting an institution of higher learning of its "lifeblood" power to offer particular degree programs, Op. Att'y Gen.88-154.[4]
Again, let me emphasize that the line of demarcation between these two categories has never been drawn by the Arkansas Supreme Court. It is therefore impossible for me to confidently say whether dictating the venue of Razorback football games is a power "vested" in the Board. However, there is a reasonable two-part test which may answer the question: (1) Is the power one that the University board has traditionally exercised? and (2) Does the power indeed involve the making of substantive policy? If so, the venue decision should be made by the Board, guided by its fiduciary obligations to the University.[5]
I think the answer to both of the questions just posed is probably "yes," but answering them will turn on considering the facts. There is obviously a spectrum of potential difficulty in determining whether a particular issue is one of substantive policy, with some issues clearly qualifying while others do not. As I have previously noted, the courts have not yet developed any set of objective factors to consider in determining what constitutes an issue of substantive policy. Perhaps future decisions will provide guidance on a case-by-case basis. In the present case, a court looking at these two questions would probably seek a broad range of factual evidence before reaching a conclusion. Although the court's factual inquiry should focus only on the issue of who should make the venue decision, not on what that decision should be, the inquiry might nevertheless be intensive. For instance, deciding whether the venue decision is one of substantive policy could require significant factual inquiry into such matters as the likely economic effects of the decision, the effect on University affairs and the general public interest. I am not in a position to make those factual determinations.
In closing, I will simply note that regardless of which body ultimately decides the venue issue, the decision will be made by a group representative of all Arkansans. As an elected body, the Legislature obviously reflects the will of citizens throughout the state. Moreover, A.C.A. § 6-64-201 dictates that membership on the Board be divided among the state's congressional districts. This requirement of geographical diversity is clearly designed to ensure that the Board make its decisions based on a statewide perspective, not merely a regional one.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] The legislative power to consolidate or abolish Amendment 33 boards distinguishes them from constitutional agencies on the order of the Game and Fish Commission or the Highway Commission. Moreover, the Legislature retains the power of appropriation over Amendment 33 boards.
[2] Adkins even persuaded the board to change the name of the new football stadium from "Bailey Stadium" to "Razorback Stadium." Id. at 177. Fulbright exacted revenge for his dismissal by first defeating an Adkins protégé in a congressional race and later defeating Adkins himself in a Senate race. Id. at 181.
[3] Given the fact that Amendment 33 forbade the transfer of board powers vested as of January 15, 1943, and possibly all powers that vested thereafter, the date recited in this statute is clearly not applicable. What I find significant is the Legislature's recognition that the Board should be free to exercise its traditional power and authority.
[4] My predecessor's conclusion in Op. Att'y Gen. 88-154 was echoed inBoard of Trustees v. State Board of Higher Education, Faulkner County Circuit Case No. CIV-95-201, in which the court ruled that the University of Central Arkansas Board of Trustees could not be prohibited from instituting a doctoral program by order of the State Board of Higher Education, which has been since been replaced by the Arkansas Higher Education Coordinating Board. A.C.A. § 6-61-201 (Supp. 1999).
[5] Although the Board owes fiduciary obligations exclusively to the University, I should note that the University is a state-funded institution, which might well warrant the Board's considering the general public interest in making its determination.